145 A.3d 1105

LISA MILLS, PLAINTIFF, v. RONALD MILLS, DEFENDANT.

Superior Court of New Jersey
Chancery Division
Ocean County
Family Part

Decided: June 21, 2016

*Marianna Pontoriero*, attorney for plaintiff (*The Pontoriero Law Firm*, attorneys).

*Ronald Mills*, defendant pro se.

L.R. Jones, J.S.C.

This case presents legal issues involving an alimony obligor's loss of employment and interpretation of the recent, 2014 amendments to New Jersey's alimony statute, *N.J.S.A.* 2A:34-23(k). Specifically, defendant seeks a reduction of his alimony obligation to plaintiff based upon losing his prior long-term employment and subsequent obtaining of a new job at a significantly lower salary. In turn, plaintiff opposes an alimony reduction.

For the reasons set forth in this opinion, the court grants defendant's application for a reduction in his alimony obligation, and holds the following:

(1) Under the recent 2014 amendments to New Jersey's alimony statute, and newly enacted subsection *N.J.S.A.* 2A:34-23(k), a court may reduce an alimony obligation when the obligor loses his or her prior W-2 employment, and thereafter makes reasonable attempts to find substitute employment;

(2) In interpreting and applying the new statutory language to a case where an obligor loses his job and obtains replacement employment at a substantially lower salary, a fundamental approach to addressing such a situation inherently

involves two questions of equity: (A) Was the supporting spouse's choice in accepting particular replacement employment objectively reasonable under the totality of the circumstances? (B) If so, what if any resulting adjustment in support is fair and reasonable to both parties under the facts of the case?

(3) The terms and spirit of the 2014 amended alimony statute, *N.J.S.A.* 2A:34-23(k), are relevant and applicable in this case, where the parties were divorced prior to September 10, 2014, but where (a) the parties' agreement contained no contractual provision defining or limiting the standards for reviewing a modification of support based upon loss of employment and decrease in financial circumstances, and (b) the issue has not already been litigated and adjudicated by the court in prior post-judgment proceedings.

## FACTUAL BACKGROUND

Plaintiff and defendant divorced in 2013 following thirteen years of marriage. They have two children, who are presently ages thirteen and eleven. At the time of their divorce, the parties agreed that defendant would pay plaintiff limited duration alimony in the amount of $330 per week for eight years, as well as child support of $200 per week, pursuant to the Child Support Guidelines, *Current N.J. Court Rules*, Appendix IX-A to *Rule* 5:6A. At the time of their settlement, defendant was employed as a district sales manager for a company selling residential and commercial flooring services, while plaintiff worked as a teacher.

The parties' settlement agreement contained no contractual provision regarding what would happen to defendant's support obligation in the event of a substantial change of circumstances, such as defendant's loss of employment or reduction in income. The agreement was, however, expressly based upon a stipulated financial baseline of defendant earning gross income of approximately $108,000 per year, and plaintiff earning approximately $59,000 per year.

In January 2015, after twelve years of working at the same company in flooring sales, defendant involuntarily lost his job when his employer restructured its business plan and essentially eliminated defendant's position. The employer provided defendant with a one-time severance payment of approximately $35,000,

along with a letter of recommendation regarding his positive job performance and history with the company.

Defendant shortly thereafter began searching for a new job, and in April 2015, received an offer of employment for a similar position from another company in the flooring industry, but at a significantly lower salary of approximately $70,000 per year, plus a $6,000 annual car allowance. Facing the economically difficult decision of whether to accept the job offer and lower salary or decline the opportunity and continue searching for another job at a salary closer to his prior income, defendant ultimately decided to accept the position and commenced employment.

After starting at his new job, defendant initially continued to pay plaintiff alimony at the same level of $330 per week, as he had the severance pay from his prior employment available as a temporary supplement to his now-reduced income. Approaching year's end, however, he essentially exhausted the severance pay. On or about November 24, 2015, defendant filed a motion with the court to prospectively modify and reduce his support obligation, based upon a substantial change in circumstances. Meanwhile, defendant also earned a year-end performance bonus of $6,000, thereby bringing his annual compensation at his new employer to $82,000.

Defendant stressed that at $82,000, he had still suffered a loss of employment and a substantial decrease of approximately twenty-five percent of his prior salary which served as the baseline foundation for his court-ordered support. Conversely, plaintiff argued against a reduction in alimony, questioning the circumstances under which defendant lost his prior employment, and representing that a decrease in support would create economic difficulties for her in maintaining her present budget. Plaintiff essentially contended that defendant had an income potential of at least $108,000 and that he failed to sufficiently demonstrate that he could not continue to earn at least this level of income. Thus, the thrust of defendant's position was that defendant was underemployed, and the court should impute defendant's prior recent

income of at least $108,000 to him and keep his support obligation to plaintiff intact.

The matter proceeded to a contested hearing in which both parties had the opportunity to testify and present their positions. During the hearing, defendant credibly asserted that when he originally began working at his prior employment twelve years earlier, he was earning $50,000 per year. Over the course of a decade's time as a valued employee, however, he gradually worked his way up the financial ladder in the same company, with his salary periodically increasing as well. Defendant explained that this commitment of time and effort was how he incrementally increased his prior income at his prior employment, a process that could not necessarily be automatically or easily duplicated by simply walking into a new position with a new company and immediately commanding the same salary. Further, defendant was an at-will employee at his prior position and was subject to termination at any time at the employer's discretion. This was, in fact, how he lost his job, when the employer restructured and eliminated his position.

## LEGAL ANALYSIS

Prior to the statutory amendments to New Jersey's alimony statute on September 10, 2014, the law concerning circumstances when an obligor lost his or her W-2 employment and then obtained a significantly lower-paying position developed through case law. The disparity of factual scenarios and results in these cases, however, sometimes led to uncertainty and ambiguity in the realm of family court practice regarding the applicable standard for resolving the ultimate question of whether an obligor should, or should not, receive a reduction in support in such circumstances.

As a result, in situations where an obligor such as defendant lost his or her long-term W-2 employment, but had the subsequent opportunity to take a new job at a significantly lower salary, the obligor would sometimes find himself or herself in a "Catch 22" situation. Specifically, no matter what decision he or she made in

accepting or declining a new position at lower pay, that decision might subsequently be critiqued, criticized and even legally challenged by an ex-spouse who, in resisting a reduction in alimony, might contend that the supporting spouse made an inappropriate choice and therefore should not receive a reduction in his or her support obligation. For example, when a supporting spouse lost his or her job and then <u>declined</u> an offer to take a lower paying position, either in the same or different field, and instead kept searching for a higher-paying position while seeking a reduction in support, the supported spouse would often argue that the obligor unreasonably bypassed an opportunity to earn at least some income that could have been used to pay some of the ongoing support obligation and mitigate against the rapid accumulation of unpaid arrears. In such circumstances, the supported spouse would often cite principles such as those in *Arribi v. Arribi*, 186 *N.J.Super.* 116, 118, 451 A.2d 969 (Ch. Div. 1982), in which the court stated the following:

> [O]ne cannot find himself in, and choose to remain in, a position where he has diminished or no earning capacity and expect to be relieved of or be able to ignore the obligations of support to one's family. ... [The obligor] cannot be content with waiting for the "right" job to appear when he is obligated to pay support for his child.
>
> [*Ibid.*]

Reciprocally, if a supporting spouse <u>accepted</u> the offer for new employment at a substantially lower salary and then sought a reduction in support, a supported spouse would often argue that the obligor was underemployed because he or she accepted a position at a significantly decreased level of pay or proven "income potential," while simultaneously trying to pass the financial burdens and consequences of such choice onto the shoulders of the supported spouse through a reduction in support. In such cases, the supported spouse would often cite to cases such as *Storey v. Storey*, 373 *N.J.Super.* 464, 474–480, 862 A.2d 551 (App. Div. 2004), which held: "[I]t is not enough to show some job, any job." *Id.* at 473, 862 A.2d 551. In *Storey*, the court held that held that a computer hardware specialist who lost his job and began a new career as a massage therapist would still be imputed at higher

earnings for support purposes based on prevailing wages for computer service technicians.

In such cases, the supported spouse would also often cite to other opinions such as *Deegan v. Deegan*, 254 *N.J.Super.* 350, 358–59, 603 *A.2d* 542 (App. Div. 1992), which held that when an obligor retires or changes his or her career, he or she was not free to disregard a prior existing duty to pay support. Instead, the case established a balancing test to determine whether an obligor's career change was reasonable under the circumstances and whether the advantage to the supporting spouse substantially outweighed the disadvantage to the supported spouse. *See Storey, supra*, 373 *N.J.Super.* at 469–70, 862 *A.2d* 551.

It is noted that *Storey* dealt with situations in which the obligor's replacement job was in a different field, which created an extra layer of analysis than in cases where an obligor took a replacement job at lower pay in the same field. Specifically, in *Storey, supra*, 373 *N.J.Super.* at 472, 862 *A.2d* 551, the court cited to yet another prior reported opinion with differing results, *Dorfman v. Dorfman*, 315 *N.J.Super.* 511, 719 *A.2d* 178 (App. Div. 1998), wherein the obligor lost his job and took a replacement position in the same field earning substantially less money. The *Storey* court essentially held that the analysis was different in *Dorfman* because *Dorfman* did not involve a switch to an entirely new career following loss of employment. Said the *Storey* court:

[W]e distinguish *Dorfman* ... a case in which an accountant, following termination by his firm, accepted lower work as an accountant after a concerted effort to find the same work at comparable pay. An obligor who makes that showing demonstrates that he or she is working at capacity in employment consistent with skills and experience; stated differently, that obligor establishes that he or she is not voluntarily underemployed in the new job. ... In such cases, absent evidence undermining the supporting spouse's proofs, there is no need for further inquiry and alimony should be recalculated based on current financial circumstances. This conclusion is mandated by a well-established principle, i.e., support orders are based on the obligor's ability to pay. ... In contrast, where a layoff is followed by a shift to a job that does not draw on prior skills and experience, the obligor must explain that choice with reference to other options explored and efforts to find work with comparable pay.

[*Storey, supra*, 373 *N.J.Super.* at 472, 862 *A.2d* 551.]

Irrespective of whether the obligor took a new job in a similar field or a different field, however, support recipients would in either instance often argue that any substantial reduction in the obligor's pay constituted underemployment, and that the court should impute the obligor's prior income as the obligor's income potential, even if his or her new actual income was significantly less than the prior amount. Litigants would often cite to cases and principles such as those in *Gertcher v. Gertcher*, 262 *N.J.Super.* 176, 177, 620 *A.*2d 454 (Ch. Div. 1992), which stated: "[O]ne of the strongest indicators of a party's ability to earn is the salary which he or she was recently earning, especially when a party has been unemployed for only a brief period of time." Thus, for example, if an obligor lost his or her job earning $75,000 and obtained a replacement job in either the same or a different field at $50,000, and sought a reduction in support thereafter, the party receiving alimony might potentially contend that the court should still impute $75,000 to the obligor and deny any reduction in support accordingly.

In summary, prior to the 2014 amendments, there were various reported cases and principles that led to various standards, considerations, and conclusions. Given the various differences and results in cases such as *Arribi, Storey, Deegan, Dorfman, Gertcher*, and others, a reading and analysis of these various pre-amendment decisions pointed to the conclusion that there was no one-size-fits-all legal analysis for approaching and analyzing these types of issues. Rather, all cases were, and continue to be, fact sensitive, and there were no bright-line rules governing applications to modify support based upon a substantial change in circumstances. *See Storey, supra*, 373 *N.J.Super.* at 469, 862 *A.*2d 551. Further, imputation of income was a discretionary matter not always capable of precise or exact determination. *Id.* at 474, 862 *A.*2d 551.

In 2014, the New Jersey Legislature amended the State's alimony statute and added a new provision, *N.J.S.A.* 2A:34-23(k), which now addresses situations when an obligor who is a W-2 employee loses his or her job and seeks a reduction in alimony as

a result. *N.J.S.A.* 2A:34-23(k) sets forth the following list of statutory factors for consideration on an application to modify an existing alimony obligation of such an obligor:

(1) The reasons for any loss of income;

(2) Under circumstances where there has been a loss of employment, the obligor's documented efforts to obtain replacement employment or to pursue an alternative occupation;

(3) Under circumstances where there has been a loss of employment, whether the obligor is making a good faith effort to find remunerative employment at any level and in any field;

(4) The income of the obligee; the obligee's circumstances; and the obligee's reasonable efforts to obtain employment in view of those circumstances and existing opportunities;

(5) The impact of the parties' health on their ability to obtain employment;

(6) Any severance compensation or award made in connection with any loss of employment;

(7) Any changes in the respective financial circumstances of the parties that have occurred since the date of the order from which modification is sought;

(8) The reasons for any change in either party's financial circumstances since the date of the order from which modification is sought, including, but not limited to, assessment of the extent to which either party's financial circumstances at the time of the application are attributable to enhanced earnings or financial benefits received from any source since the date of the order;

(9) Whether a temporary remedy should be fashioned to provide adjustment of the support award from which modification is sought, and the terms of any such adjustment, pending continuing employment investigations by the unemployed spouse or partner;

(10) Any other factor the court deems relevant to fairly and equitably decide the application.

Notably, the new statutory language does not appear on its face to draw a clear distinction between situations when one obtains in a new job in the same field as opposed to a new field. Rather, *N.J.S.A.* 2A:34-23(k)(2) expressly references when an obligor loses his or her employment, the court may consider the obligor's documented efforts to obtain replacement employment or to pursue an alternative occupation. Further, *N.J.S.A.* 2A:34-23(k)(3) provides that a court may consider the obligor's good faith effort to find remunerative employment at any level and in any field.

Moreover, the amended statutory language does not expressly establish or provide a specific standard for statutory analysis in

situations when an obligor actually obtains new employment at significantly lower pay, and then seeks to reduce an existing support obligation over the obligee's objection. As a result, further legal questions arise regarding the specific legal standard for review. For example, does the new statutory language of *N.J.S.A.* 2A:34-23(k) supersede and/or alter the principles and modes of analysis set forth in prior, pre-amendment cases such as *Arribi, Storey, Deegan, Dorfman*, and *Gertcher*, so that these cases are no longer applicable? Or alternatively, does the new statutory language somehow merge with prior case law and reconcile as opposed to superseding same?

In attempting to answer this question, the court has considered the various aforementioned cases, as well as the new statutory language in the 2014 amendments to the alimony statute. Applying reason, logic, and practicality, the court has further searched for a simplifying common denominator and thread that runs through not only all of the aforementioned pre-amended statute cases, but also through the implicit terms and spirit of the amended statute itself, even if not expressly stated therein.

In doing so, the court concludes that as matter of equity and fairness, the most reasonable, consistent, and straightforward, analysis—which is in one way or another supported by all of these differing cases and new statutory language—consists of the following practical two-step inquiry. First, was the supporting spouse's choice in accepting a particular replacement employment opportunity objectively reasonable under the totality of the circumstances? Second, if so, what if any resulting support adjustment should occur that is fair and reasonable to both parties, given their respective situations? The focus on these two questions, in supplement to the factors enumerated in *N.J.S.A.* 2A:34-23(k), is logical and wholly consistent with factor 10 therein, which states that a court may consider, in addition to the other enumerated factors, any other factors the court deems relevant to fairly and equitably decide an application for reduction in support. *N.J.S.A.* 2A:34-23(k)(10).

In applying the statutory criteria of *N.J.S.A.* 2A:34-23(k) to this matter, the court finds that the reason for defendant's loss of income was a restructuring and elimination of his position at his prior at-will employment. Defendant made legitimate efforts to obtain new employment in the same or similar field and in fact reasonably did so in good faith relatively soon after losing his job. The court further notes that there were no health-related impediments to defendant working or finding new employment, and as noted, he received a severance form his prior employment which helped defer his need to file a motion to reduce his alimony until the end of the 2015 calendar year.

Regarding the defendant's new, lower paying employment, the court first finds that defendant's decision to accept a significantly lower-paying job following the loss of his prior employment was in fact reasonable and appropriate under the circumstances of this case. Pursuant to *N.J.R.E.* 201(b), the court takes judicial notice that losing a longtime job can be one of the most difficult and challenging events in a person's life, particularly when the displaced employee is the primary financial provider in a family. Moreover, we live in an era of severe recent economic downturn in the United States. *Piscitelli v. Classic Residence*, 408 *N.J.Super.* 83, 114, 973 *A.*2d 948 (App. Div. 2009). Regarding displaced employees presently searching for work, supply often exceeds demand in countless fields. For every open position, there may be dozens or even hundreds of qualified job-seekers aggressively fighting to fill a seat. *Benjamin v. Benjamin*, 430 *N.J.Super.* 301, 305, 64 *A.*3d 247 (Ch. Div. 2012).

For many people, the harsh, present-day reality is that once they lose a position, they may never return to a similar income, no matter how diligently they try. At the very least, a person who has lost a longtime job in the current financial climate may need a reasonable transition period to seek new employment. *See Gnall v. Gnall*, 432 *N.J.Super.* 129, 159–60, 74 *A.*3d 58 (App. Div. 2013). Further, such re-employment may out of necessity be at a significantly lesser salary than he or she previously earned at a prior

job, simply as a way to get a "foot in the door" of a company where he or she has a reasonable opportunity to start over again and grow under the circumstances.

In this case, while the salary at defendant's new position was lower than what he had previously earned, defendant nonetheless made an objectively reasonable decision in responsibly trying to begin again at a new place of employment. Further, the starting salary enabled him to support himself and still honor the majority of his prior agreement to pay support, albeit at a reduced level, at the same time. Moreover, the opportunity for potential performance bonuses, though not guaranteed, was a relevant consideration as well.

Defendant's choice to accept a replacement job in the same field of his expertise, paying $76,000 per year with or without a $6,000 performance bonus, was objectively reasonable. While the salary was not $108,000, the income level was objectively sufficient as a starting point with a brand new employer to justify acceptance of same. In fact, the court finds that defendant was very fortunate in this economy to find replacement work in his same field so quickly. Conversely, the declining of such an offer could have been a $76,000 mistake, and might have potentially left defendant with no employment at all for months or longer.

Further, there is no objective evidence that defendant was deliberately underemployed or unreasonably turned down or avoided job opportunities at higher income levels. Rather, he did what many providers in financially intact families are often forced to do after losing a job in a troubled economy, which is to accept a substantial decrease in pay in exchange for the opportunity of employment as opposed to unemployment.

■ Since defendant acted reasonably in accepting lower-paying employment, the next question is what if any resulting support adjustment should occur that is reasonable and fair to both parties. After considering the parties' financial circumstances and the criteria set forth under the alimony statute, the court decreas-

es defendant's weekly alimony obligation by $80 per week, from $330 per week to $250 per week. This adjustment saves defendant several thousands of dollars per year in alimony, while simultaneously enabling defendant to honor the bulk of his agreement to pay alimony to plaintiff under the terms of their prior settlement. While both parties will likely suffer financial stress and burdens as a result of the modified arrangements, such consequences are not placed solely on the obligor or the obligee, but are fairly placed on both parties. Moreover, in considering the parties' financial circumstances and budgets, the court finds the adjustment to be financially equitable and reasonable under the totality of both parties' circumstances.

As defendant's alimony obligation has been modified from $330 to $250 per week, the court re-runs the child support guideline worksheet. Defendant's prior child support obligation was based upon his earning $108,000 per year, plaintiff earning $59,000 per year, and defendant paying plaintiff alimony of $330 per week, which was deducted from defendant's income and added to plaintiff's income for child support purposes under the guideline worksheet. By generating a new guideline worksheet utilizing defendant's income at $82,000 and plaintiff's income at $59,000, with defendant paying plaintiff alimony of $250 per week, the guidelines reflect a revised child support obligation of $194 per week.

The court is aware that defendant's income may potentially increase if he obtains a different job, or if performance bonuses at any employment substantially increase beyond $6,000. Therefore, an additional provision will be included in the order modifying alimony. Specifically, if there are any changes in defendant's employment or income structure, he will notify plaintiff in writing within thirty days. Additionally, both parties are ordered to supply the other with proof of the prior year's income by May 1 of each calendar year. These provisions are consistent with *N.J.S.A.* 2A:34-23(m), which expressly permits a court to issue various remedies, including but not limited to periodic review of income, or

any other remedy the court finds appropriate to assure fairness and equity to both parties.[1]

## APPLICABILITY OF AMENDED ALIMONY STATUTE

■ A final question concerns the issue of whether the 2014 amendments to the alimony statute are in fact procedurally and substantively applicable in this specific case. The parties were divorced in 2013. The amendments were enacted on September 10, 2014, and defendant's loss of employment and decrease in income triggering this entire proceeding took place in 2015.

Regarding the effective date of the amended alimony statute, the Act contains the following language:

> This act shall take effect immediately, and shall not be construed either to modify the duration of alimony ordered or agreed upon or other specifically bargained for contractual provisions that have been incorporated into: a. final judgment of divorce or dissolution; b. a final order that has concluded post-judgment litigation; or c. any enforceable written agreement between the parties.

There have been two recently published and distinguishable appellate opinions that address the issue of the amended statute's applicability or non-applicability to previously decided or settled divorces. The first of these cases is *Spangenberg v. Kolakowski*, 442 *N.J.Super.* 529, 125 *A.*3d 739 (App. Div. 2015), which involved an application to terminate alimony based upon the alimony recipient's cohabitation with a boyfriend. At first glance, this case may appear to stand for a general, universal proposition that the amended alimony statute can only apply to divorces finalized after September 10, 2014, and cannot ever be applied to any issue in any case of any kind where the parties' divorce pre-dates September 2014. *Spangenberg*, however, neither expresses nor implies such a legal conclusion and black-letter rule of universal exclusion in every case. Nor does the wording of the statute reflect a legislative intent for the statute to be automatically inapplicable in

---

[1] Ultimately, defendant lost the replacement job as well, but the parties stipulated that such circumstance would not further affect the analysis in this case.

every single matter where the parties divorced prior to September 10, 2014.

To the contrary, in *Spangenberg*, the court notes that the parties had an express contractual stipulation in their divorce settlement agreement regarding the effect of cohabitation on alimony and had specifically agreed in writing to apply the pre-amendment case law of *Gayet v. Gayet*, 92 *N.J.* 149, 456 *A*.2d 102 (1983) and applicable evolving case law. *Gayet* was a New Jersey Supreme Court case that held mere cohabitation was not enough to terminate alimony. Rather there needed to be a showing of some type of ongoing economic interdependency between the alimony recipient and his or her live-in paramour. *Id.* at 154–55, 456 *A*.2d 102. The amended alimony statute of September 10, 2014, substantively departed from *Gayet* on cohabitation by permitting the possibility of termination or suspension of alimony even without proof of economic interdependency (or full-time co-residency).

Moreover, the *Spangenberg* court expressly noted that in 2013, subsequent to the parties' divorce decree but prior to the 2014 statutory amendments, the parties had already returned to court on post-judgment proceedings regarding the obligor's attempt to modify alimony based upon the recipient's cohabitation. Further, the court had at that time conducted a proceeding and denied the obligor's request for a termination of alimony.

Accordingly, under the facts of the case, the *Spangenberg* court denied the alimony obligor's application to revisit the issue of cohabitation under the terms of the new alimony statute as an attempt by the obligor to apply the new statute in order to: (a) circumvent the parties' explicit contractual agreement regarding use of the *Gayet* standard and (b) essentially re-visit issues already heard and decided by the court in 2013. The obligor's attempt was a clear violation of the terms of the amended statute in these two specific respects, as the Act explicitly states that the 2014 amendments shall not be construed to modify specifically bargained-for contractual provisions in a final judgment of divorce

or dissolution or a final order that has concluded post-judgment litigation.

While this court will not engage in unnecessary speculation, it is not so clear that the result in *Spangenberg* would have remained the same if, for example (1) the parties' divorce settlement contained no express contractual provisions referencing *Gayet* or any other contractual standard for review of alimony upon cohabitation, and/or (2) there had not already been a subsequent, post-judgment hearing that addressed and adjudicated the issue of alimony and cohabitation prior to the enactment of the statutory amendments. In such a hypothetical instance, application of the amended alimony criteria would not have affected a pre-existing contractual provision setting a different standard for review; nor would application of the amended statute have otherwise contradicted or re-opened a concluded post-judgment proceeding so as to again address the same exact adjudicated issues regarding alimony and cohabitation.

What is clear, however, is that *Spangenberg* did not address, and did not have to address, the entirely distinguishable circumstance set forth in the present case, where (1) the parties had no prior contractual agreement regarding the standard for review of alimony based upon an obligor's loss of employment and decrease in financial circumstances, and (2) there had been no prior post-judgment adjudication, or even litigation, of the issue in current dispute at any time before the present application. That issue is the impact that the obligor's loss of employment and incurrence of a substantial change in his financial circumstances should have upon his alimony obligation. Moreover, in this case, defendant's loss of employment did not even occur until after the amended statute went into effect.

The second post-amendment case regarding the applicability of the amended alimony statute to pre-amendment cases is *Landers v. Landers*, 444 *N.J.Super.* 315, 133 *A.*3d 637 (App. Div. 2016). *Landers* involved an applicant's request to terminate or modify alimony based upon his retirement. Unlike applications to modify

alimony based upon (a) cohabitation, or (b) loss of an obligor's employment, the 2014 statutory amendments actually included a specific provision that established a specific standard and criteria for a modification of a pre-amendment alimony agreement based upon retirement. *See N.J.S.A.* 2A:34-23(j)(3). Therefore, *Landers* is only applicable in cases regarding requests to modify alimony based upon retirement, which is not an issue in the present case.

In enacting the 2014 amendments, it appears that the legislative intent was to prevent the amendments themselves from becoming an independent basis for a party to unilaterally attempt to un-do a contractual agreement on the standard for review, or to obtain a do-over on every alimony case previously decided before the amendments became law. Otherwise, all litigants who are dissatisfied with the binding terms of a prior final agreement or court decision and order regarding alimony, entered prior to September 10, 2014, could simply return to court for a second bite of the legal apple on the grounds that the 2014 amendments somehow now permit all prior litigants to do so. Logically, the allowance of such an unreasonably expansive retroactive process could swamp and overrun the entire family court system and, in the case of previously negotiated and contractual alimony settlement agreements, improperly allow one party to disavow himself or herself of certain provisions and obligations to the other party after having previously accepted the benefits of any trade-offs or reciprocal provisions beneficial to that party under such agreement as well.

In this case, the obligor is only seeking to modify alimony based upon a substantial change of circumstances, a right that existed under the law both before and after September 10, 2014. Even before the 2014 amendments to the alimony statute, and at the time of the parties' divorce settlement agreement as a matter of basic elementary law, the obligor always had the inherent legal right to seek a modification of his alimony obligation based upon a substantial change of circumstances under *Lepis v. Lepis*, 83 *N.J.* 139, 416 *A.2d* 45 (1980). This right was not in any way modified or canceled by the parties in their settlement agreement. As such,

defendant's right to seek a modification of alimony was intact and implicitly part of the divorce settlement agreement itself, whether or not the Legislature ever subsequently amended the alimony statute in 2014. Further, and as previously noted, the court had the discretion under the pre-amendment statute to consider any other factors deemed relevant, which could logically include those factors that are also relevant under a post-amendment analysis.

The court notes that if the Legislature intended to exclude every single litigant who was divorced prior to September 10, 2014, from invoking the terms of the amended statute to address any post-judgment loss of employment or substantial downturn in circumstances arising after such date, the Legislature could have easily stated so in the statute, with a simple sentence such as: "The terms of *N.J.S.A* 2A:34-23(k) may not be invoked by any litigant who was divorced prior to September 10, 2014, even if the loss of employment or other downturn in financial circumstances occurred after said date and was not previously addressed in the parties' settlement agreement or by a court." The statute, however, does not contain any such vast exclusionary language, and there is no basis for this court to find that such language exists by implication. To the contrary, the court finds that the logical intent of the Legislature was to create a greater degree of fairness and equity for supporting spouses who legitimately lose their jobs and suffer a downturn in financial circumstances. An overly restrictive reading of the statutory amendments would now have the impact of immediately blocking and prohibiting an entire generation of people, who happened to be divorced before September 2014, from ever invoking the liberalizing terms of the amended statute in the event they ever, at any time in the future, genuinely lose their jobs and thereafter need to seek relief from the court as a matter of fairness and equity.

In this case, the court concludes that where this obligor is seeking a modification of alimony based upon a loss of employment, the court may apply the terms and spirit of the 2014 amended alimony statute, even if the parties were divorced prior

to September 10, 2014, so long as (a) the parties had no written agreement to apply a different standard, and (b) the issue has not already been litigated and adjudicated by the court. Moreover, the fact that the defendant's loss of employment and change of circumstances did not occur until after September 10, 2014, further supports the fundamental fairness and equity of this conclusion in this case.

As a final note, however, even if the court was hypothetically applying pre-amendment law, defendant has in this particular case still demonstrated a sufficient change of circumstances under *Lepis* to equitably warrant the modification in support which the court has ultimately granted in this matter.