**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1878-19

MEGAN LEPORE,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

GERARD LEPORE,

      Defendant-Appellant/
      Cross-Respondent.

_____

        Submitted February 22, 2021 – Decided April 8, 2021

        Before Judges Sabatino and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0759-09.

        Horn Law Group, LLC, attorneys for appellant/cross-respondent (Jeff J. Horn, of counsel and on the brief; Jessica R. Carosiello, on the briefs).

        Kozyra & Hartz, LLC, attorneys for respondent/cross-appellant (Judith A. Hartz, of counsel and on the brief; Ronald J. Herman, on the briefs).

PER CURIAM

This appeal and cross-appeal mainly concern the Family Part's disposition of a father's post-divorce motion to reduce his child support obligations for the parties' three unemancipated children. For the reasons that follow, we remand for a plenary hearing, predominantly to enable the court to reconsider its determination that it lacked authority to recalibrate the imputed annual earnings level for the father, which was set forth in the divorcing parties' Property Settlement Agreement ("PSA") more than eleven years ago.

Because we are remanding the matter for further development of the record, we need not discuss the facts comprehensively. The following details will suffice for our purposes.

Plaintiff Megan LePore ("the mother") and defendant Gerard LePore ("the father") were married in June 1998. Three children were born of the marriage: twin boys born in October 2000, and another son born in December 2002.

While the parties were married, the father was a business executive in the pharmaceutical industry, netting annual income between $300,000 to $1.38 million between 2000-2007, with his highest-earning years in 2006 and 2007.[1]

---

[1] We discuss the parties' finances and the terms of the PSA in this opinion by necessity, as they are at the heart of the issues on appeal. Likewise, the father's medical condition that has impacted his career decisions also must be mentioned.

2

The father was the primary wage earner while the mother stayed home to raise the three children.

In 2005, while the parties were still married, the father was diagnosed with leukemia. Since his initial diagnosis, the father has had four recurrences, each time having to undergo chemotherapy treatment. The father contends the cancer diagnosis, along with "extensive business travel, tremendous stress caused by the business, and forced time away from family led [him] to sell his shares in the pharmaceutical marketing business." The father sold his shares in that business in 2008, a year before the parties divorced, and a substantial portion of the profit from the sale was distributed to the mother.

After leaving the pharmaceutical industry in 2008, the father started a yoga studio business, Powerflow Yoga. As a result, his annual income drastically declined to $82,159 in 2008 and $12,844 in 2009, the year the parties divorced.

As of the time of the post-judgment motion filed by the father, Powerflow had ten locations in New Jersey and two franchise locations in South Carolina. According to the father's motion certification, Powerflow "operates at a small loss," and he "recently started to take home a salary of approximately $140,000 per year."

3

A-1878-19

The parties divorced in November 2009 and, as we have noted, executed a PSA with the assistance of their respective counsel. For purposes of determining child support and alimony, the parties agreed in the PSA to impute annual income of $500,000 to the father and $35,000 per year to the mother. Based on these imputed incomes, the father agreed to pay the mother limited duration alimony of $14,000 per month for a term of seven years and $4,000 per month in child support for the three children. The parties divided about $2 million from the sale of the pharmaceutical business, and each have used those assets to pay the ongoing needs of themselves and the children. According to the father, he has depleted approximately $3 million in assets since the time of the divorce. He has paid all of the limited-duration alimony.

The twins enrolled as first-year undergraduates at a private university in Pennsylvania in the fall of 2019, and they were residing at college pre-pandemic. Their college costs are being funded through a combination of 529 savings accounts and financial aid. Meanwhile, as of the time of the motion practice, the youngest child was a high school junior living with his mother.

The father engaged in self-help after the twins started college and unilaterally reduced his monthly child support payments. He then filed a motion to modify child support, which the mother opposed in a cross-motion. Both sides sought counsel fees.

4

After an oral argument at which the father was sworn and answered only one question (confirming to the judge his present health and his ability to work), the judge issued an order on December 5, 2019, accompanied by a Statement of Reasons. The order, in relevant part: (1) adjusted the father's child support obligation for the youngest child to $465 per week (approximately $2,000 per month), retroactive to September 17, 2019, the filing date of the father's motion; (2) reduced the father's child support obligation for the twins combined to $1,000 per month, retroactive to September 17, 2019; (3) directed the father to pay child support arrears; and (4) denied both parties' requests for counsel fees. The order contained other miscellaneous provisions that are not germane to this appeal.

On appeal, the father argues the trial court: (1) erred in calculating child support for one child at home by misapplying the Child Support Guidelines in excess of $187,200 yearly income pursuant to Rule 5:6A, Appendix IX-A(20)(b); (2) erred in utilizing the Child Support Guidelines without factoring in health insurance premiums paid by the father for the benefit of the minor child pursuant to Rule 5:6A, Appendix IX-A(26); (3) made no finding that the father is voluntarily underemployed, thereby erring in continuing to impute to the father an annual income of $500,000; and (4) erred by essentially requiring the father to work and maintain the level of income imputed to him at the time of

5

the divorce indefinitely. The father only appeals the amount of his child support obligation for the youngest son, and he does not appeal the $1,000 monthly child support the court directed for the twins.

In her cross-appeal, the mother argues the trial court erred in calculating the child support for the youngest child living at home by failing to supplement the Child Support Guidelines award through the application of the statutory factors in N.J.S.A. 2A:34-23(a) as allegedly mandated by Rule 5:6A, Appendix IX-A(20)(b). Additionally, the mother cross-appeals the denial of her counsel fees.

In analyzing these contentions, we are guided by familiar principles of family law and appellate review. In general, a party's motion to modify a support obligation "rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." Martindell v. Martindell, 21 N.J. 341, 355 (1956) (citations omitted). Ordinarily, we will not disturb the trial court's findings unless they are demonstrated to lack support in the record with substantial, credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974); see also Pascale v. Pascale, 113 N.J. 20, 33 (1988). Given the Family Part's special expertise, appellate courts must accord particular

6

deference to fact-finding in family cases, and to the conclusions that logically flow from those findings. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998).

That said, we apply de novo review to legal issues raised on appeal in family cases. Jacoby v. Jacoby, 427 N.J. Super. 109, 116-17 (App. Div. 2012). In addition, we are empowered to set aside Family Part decisions that are shown to be arbitrary and capricious. Ibid. At times, we must remand a matter for a plenary hearing where contested material factual matters must be evaluated with the benefit of testimony. Conforti v. Guliadis, 128 N.J. 318, 322-23 (1992) (requiring plenary hearings to resolve material factual disputes); Tretola v. Tretola, 389 N.J. Super. 15, 20 (App. Div. 2006) (in which a plenary hearing was required in a child support modification case).

On the subject of child support, our courts are authorized under N.J.S.A. 2A:34-23 to issue orders providing for the "care, custody, education and maintenance of the [divorcing parties'] children, or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just. " The statute recites ten factors a court is to consider in calibrating such child support, including, as is especially pertinent here, the "sources of income and assets of each parent" (factor three), the "[e]arning ability of each parent, including educational background, training, employment skills, work

7

experience [and other considerations]" (factor four), and the "[a]ge and health of the child and each parent." N.J.S.A. 2A:34-23(a)(3), (4), and (6).

Subject to exceptions, the determination of a parent's child support obligation is generally to be guided by application of the Judiciary's child support guidelines ("the Guidelines"). Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A (2020). If the parties' combined net annual income is not above $187,200, then the Guidelines presumptively supply the appropriate child support amounts for non-impoverished parents. Pressler & Verniero, Appendix IX-A(20) to R. 5:6A. If, however, the parties' combined income exceeds $187,200, then our courts utilize the maximum Guidelines support levels up to that threshold, and then augment that support level with a discretionary supplement. Pressler & Verniero, Appendix IX-A(20)(b) to R. 5:6A; see, e.g., Isaacson v. Isaacson, 348 N.J. Super. 560, 581 (App. Div. 2002). Here, the question of whether the parties' combined incomes exceed the $187,200 Guidelines threshold depends on whether the father's annual income should continue to be imputed at $500,000, or whether some lower income should be utilized.

Also, as a general proposition, child support amounts are subject to modification by the court if there has been a material change in circumstances affecting the parties' resources or the child's needs and living situation. Lepis

v. Lepis, 83 N.J. 139, 157 (1980); Jacoby, 427 N.J. Super. at 116, 118-19.  In this case, such a change in circumstances occurred when the two older children began full-time residency away at college.  The father contends that his ongoing substantially reduced earnings since the time of the PSA also reflect a material change of circumstances.  We need not adopt or reject that argument, since the departure of the two older sons for college suffices as a material change requiring the court to conduct a fresh assessment of the unallocated $4,000 monthly support amount for all three sons.

The critical question posed here—which drives the remaining issues—is the propriety of the trial court's determination that the PSA's $500,000 imputed annual income level for the father should remain unaltered.  This, in turn, raises the question of whether the father, whose financial statement reflects that he earns only $140,000 annually, is "underemployed."

If a trial court determines that a parent is, "without just cause, voluntarily underemployed or unemployed," it must impute income to that parent.  Pressler & Verniero, Appendix IX-A(12) to R. 5:6A.  Such a finding must be made before any income is imputed.  Dorfman v. Dorfman, 315 N.J. Super. 511, 516 (App. Div. 1998).  A parent is voluntarily underemployed where he or she is "intentionally failing to earn that which he or she is capable of earning."  Ibid.

9

When imputing income, trial courts consider the parent's "potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region." Pressler & Verniero, Appendix IX-A(12)(a) to R. 5:6A. The court also should consider such additional factors as "the reason for and intent behind voluntary underemployment or unemployment; the extent other assets are available to pay support; and the ages of any children in the parent's household as well as child-care alternatives." Caplan v. Caplan, 182 N.J. 250, 268 (2005).

An obligor who has "selected a new, less lucrative career must establish that the benefits he or she derives from the career change substantially outweigh the disadvantage to the supported spouse [or children]." Storey v. Storey, 373 N.J. Super. 464, 468 (App. Div. 2004). "The burden of persuasion is on the obligor." Id. at 469.

The father argues the trial court erred by continuing to impute $500,000 in annual income to him for purposes of determining his child support obligation. As we have noted, shortly before the divorce in 2009 he earned approximately $1.2 million annually for two years. However, also before the divorce, he was diagnosed with leukemia, sold his interest in his pharmaceutical business, and started a new enterprise operating yoga studios. In his

10

certification, he asserts that the change was occasioned by the physical and emotional toll of his prior position.

Although the record presently lacks testimony and credibility findings on the subject, the annual income of $500,000 imputed to the father in the PSA appears to have been a compromise figure—one that took into account his prior earnings, an expected reduction in earnings from the change in his business, and a prediction that his new enterprise would be profitable. Since that time, the father has pursued the yoga studio business but, according to his financial statement and certification, has not generated earnings for him at or near the $500,000 annual level. In the meantime, the father has suffered four recurrences of his leukemia, and his children have grown to a point that two of them were residing away at college, with their sibling in his last two years of high school.

In assessing the situation, the trial court appears to have been under the mistaken premise that the $500,000 income imputation within the PSA is a virtually ironclad contractual commitment. In this regard, the court stated:

> Here, the parties will be imputed income of $35,000 ([the mother]) and $500,000 ([the father]) <u>because, as a matter of contract interpretation, the Court finds that the parties intended their imputed incomes to remain constant. Further, [the father] testified at oral argument that he is physically able to work in the pharmaceutical industry</u>.
>
> [(Emphasis added).]

A-1878-19

The court then compared the modification language in the college-expense portion of the PSA, Paragraph 20, with the modification language in the child support provision, Paragraph 12, which states that child support "shall be adjusted upon a termination of the [father's] alimony obligation or such other changed circumstances as permitted by law." The court wrote:

> The Court finds it significant that this provision [Paragraph 12] does not mention the parties['] changed incomes, whereas, another provision contemplated such changed financial circumstances. With respect to the children's college costs, the parties agreed [in Paragraph 20 of the PSA] that: "The parties will discuss the children's choice of school in each child's junior year of high school. Each party's obligation will be based on their respective financial circumstances existing at the time."

> Under [the father's] theory, he could have successfully moved for a reduction in child support at any time based on a substantial reduction in income—a well-established changed circumstance under Lepis— because he has not earned close to $500,000 after the divorce. See Lepis v. Lepis, 83 N.J. 139, 151 (1980) (An "increase or decrease in the supporting spouse's income" qualifies as a changed circumstance). However, that would have undermined the parties' compromise to impute income of $500,000 per year— which was substantially more than [the father] earned at the time of the divorce ($12,844 in 2009) but significantly less than he earned in the two years before he left the pharmaceutical industry to start a yoga studio ($1,129,416 in 2006 and $1,378,153 in 2007).

12

> For these reasons, the Court finds that [the mother] should be imputed income of $35,000 per year and [the father] should be imputed income of $500,000 per year. The Court will thus use these imputed incomes for purposes of calculating [the father's] child support obligations for the college students and the youngest son.

With all due deference to the trial court, this analysis treats the $500,000 income imputation within the 2009 PSA with undue rigidity. To be sure, provisions negotiated by divorcing couples within their marital settlement agreements have characteristics of contractual obligations, and should not be lightly set aside or altered. Quinn v. Quinn, 225 N.J. 34, 45 (2016). Even so, "Family Part judges possess a broad supervisory role in determining the fairness of agreements between spouses." Fattore v. Fattore, 458 N.J. Super. 75, 87 (App. Div. 2019). "In each case the court must determine what, in the light of all the facts presented to it, is equitable and fair, giving due weight to the strong public policy favoring stability of arrangements." Smith v. Smith, 72 N.J. 350, 360 (1977).

"[T]he law grants particular leniency to agreements made in the domestic arena" and vests "judges greater discretion when interpreting such agreements." Quinn, 225 N.J. at 45-46 (citations omitted). "This leniency is derived from the terms of the marital agreement and the nature of some post-judgment issues, such as . . . financial support for the family, that may require modification of the

13

marital agreement over the years as events occur that were never contemplated by the parties." Id. at 46 (emphasis added).

We are unpersuaded that the mention of the termination of alimony in Paragraph 12 of the PSA as a triggering event for adjusting child support signifies that no other subsequent event or circumstance could enable the court to modify that support. To the contrary, Paragraph 12 also states modification may be warranted by "such other changed circumstances as permitted by law." Nor are we persuaded that the mention of the parties' "respective financial circumstances existing at the time" in Paragraph 20 of the PSA concerning future college expenses rules out the court's fair consideration of the parties' actual income history on a motion to modify child support. In effect, the trial court treated the $500,000 income imputation as impervious, even though the PSA contains no "anti-Lepis" provision. This inflexible approach was erroneous. Indeed, the trial court never made a finding the father is or has been underemployed, an omission which implies his actual post-divorce annual earnings deserve fair consideration.

Because the record is not well developed on these issues, we remand for a plenary hearing. At such a hearing, the court can elicit fulsome testimony on the relevant subjects, including, but not limited to, the father's earnings history and business management, his health factors, his ability to resume working in

14

the pharmaceutical or comparable industry after more than a decade of absence, the mother's own circumstances, the original intent of the parties in the PSA, the children's present needs, and other matters bearing on support. As part of that hearing, the court may consider the impact of the COVID-19 pandemic on the twins' college residency and on the father's yoga business, and whether the third son is about to begin college.

Because of the interdependency of the income-imputation issue with the other issues raised on appeal, we decline to adjudicate them here, including the denial of counsel fees to both parties. Those issues can be further addressed at the plenary hearing on remand. In the meantime, the trial court's December 2019 order will provisionally remain in place, subject to adjustment by that court.

Remanded for a plenary hearing. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1878-19